131 So.2d 94 (1961)
Harold Joseph THERIOT
v.
SCHLUMBERGER WELL SURVEYING CORPORATION and Aetna Casualty and Surety Company.
No. 158.
Court of Appeal of Louisiana, Fourth Circuit.
April 3, 1961.
On Rehearing June 12, 1961.
*95 Adams & Reese, St. Clair Adams, Jr., New Orleans, for defendants and appellants.
Roland J. Sternfels, New Orleans, and George B. Richard, Marrero, for plaintiff and appellee.
Before McBRIDE, YARRUT, and HALL, JJ.
McBRIDE, Judge.
The defendant employer and its compensation liability insurer have appealed from a judgment in plaintiff's favor awarding him benefits under the Workmen's Compensation Act as for permanent total disability. LSA-R.S. 23:1221(2). In defense of plaintiff's claim defendants specially set up in their answer that he did not sustain an accidental injury causing disability while acting in the course and scope of his employment, and that any disability he may have sustained at any time subsequent to January 20, 1956, was caused by congenital defects of his body or other conditions completely disassociated from his employment. In their brief defendants also argue that the petition does not allege or refer to any specific accident.
Plaintiff, 24 years of age, was in the employ of Schlumberger Well Surveying Corporation for a period of about one year; before being accepted for employment, he had successfully passed a pre-occupational physical examination. His classification was "operator," the duties thereof entailing heavy manual labor such as driving trucks, setting up equipment on oil drilling rigs and handling heavy objects, including well perforating guns, some of which would weigh about 350 pounds.
On June 20, 1956, plaintiff was riding in the employer's truck driven by one Domino, their destination being the site of an oil well at Delacroix Island. Plaintiff testified the road was bumpy and he "bounced around," when all of a sudden he experienced a sharp and severe pain in the lower *96 region of his back, "and the more it bounced the more it hurt." Domino heard the statements from plaintiff indicating he was in pain. However, plaintiff worked on the job all that day. There is contention pro and con whether he reported an accident to any of his immediate superiors or to any official of the employer. It appears clear enough, however, from the conflicting evidence that while he never reported to anyone that he had met with an accident, he did report to several persons in authority that he had hurt his back.
We find no merit in defendants' contention no specific accident is declared upon in the suit. Article IV of the petition reads thus:
"On or about June 20, 1956, while acting in the course or scope of his employment for the employer, and as a result of the heavy strenuous work which he was required to do for his employer, petitioner suffered a sudden sharp pain in his back while working, which contributed to or caused in part the injury hereinafter described."
and throughout the petition plaintiff refers to the incident of June 20, 1956, as an "accident." Taking all the allegations together, it cannot be doubted that plaintiff intended to and does convey to defendants that the sudden sharp pain in his back resulted from an accident.
It is true no one else knew of any accident and that plaintiff carried the burden of proving the occurrence of an accident, but we think plaintiff's testimony alone is sufficient to support him in his claim there was an accidental injury. He had never experienced pains in his lower back before, had been in apparent good health before leaving on the truck for the job site, and experienced the sharp pains only after being bounced around on the bumpy road. These factors lend adequate corroboration. It is clear under the Workmen's Compensation Act an accident may be proved by plaintiff alone if there exists corroborating circumstances. Zito v. Standard Accident Insurance Co., La.App., 76 So.2d 25; Johnson v. Andrus, La.App., 56 So.2d 257; O'Connor v. American Automobile Ins. Co., La.App., 32 So.2d 624.
Although plaintiff continued to suffer pain for several days, he did not undertake to seek medical aid or attention but remained on his job until June 24, 1956. At the close of that day after having worked on an oil well he quit because his back was so painful he could not endure the rigors of the occupational duties.
Next day he called upon Dr. F. R. Nicholson, a general practitioner, who made a diagnosis of possible rheumatoid arthritis and frostbite of the legs. There was no orthopedic examination or X-rays, and there is nothing to support the diagnosis of arthritis. But, be that as it may, Dr. Nicholson gave plaintiff several therapeutic treatments over a period of a few weeks which proved ineffective.
Plaintiff was admitted to the Veterans Administration Hospital July 31, 1956, and his condition was diagnosed as spondylolisthesis (forward displacement of the lumbar vertebra); spondylolysis; undiagnosed disease of digestive tract characterized by heartburn and anxiety. As the orthopedic consultant was of the impression it would be detrimental to treat the patient with a support or to consider surgery, plaintiff received conservative treatment until his discharge on August 29, 1956. It was suggested he get a lighter job not requiring any heavy physical work.
Dr. Daniel C. Riordan, an orthopedic surgeon, next saw plaintiff on October 26, 1956, and November 9, 1956, at the request of an insurance company. According to Dr. Riordan the first X-rays did not show the existence of spondylolisthesis but did show a curvature of the lumbar spine. Dr. Riordan thought plaintiff was grossly exaggerating his condition and that he "does not have any orthopedic difficulty and he could return to his work without any difficulty whatever." Nevertheless, Dr. Riordan *97 administered several treatments to relieve pain if pain was actually present, and then conducted his examination on the latter date, after having reviewed the records of the Veterans Hospital, and arrived at the conclusion plaintiff had no orthopedic disease or abnormalities except a slight narrowing of the lumbosacral joints. He found no spondylolisthesis.
The next thing that occurred was plaintiff's reporting back to the Veterans Hospital on January 7, 1957, complaining of pain in his lower back which extended down his right leg. He was admitted as a surgical patient on March 7, 1957, and on April 23, 1957 a fusion of vertebrae L-4, 5, S-1 and 2 with bone graft was performed. All experts who testified relative thereto agree the operation was a success and complete fusion of the vertebrae was attained.
Apparently the next physician to see plaintiff was Dr. Nick J. Accardo, who examined him on July 8, 1958. Dr. Accardo was of the opinion that the plaintiff had a congenital spondylolisthesis and that the operation was successful and eliminated any question of pain.
Dr. William S. Neal, a radiologist, made X-ray pictures on August 27, 1958, and these, according to Dr. Neal, showed spondylolisthesis which represented a congenital defect. Dr. Neal noted the fusion of the vertebrae.
Plaintiff then went to Dr. William Fisher, a general surgeon, on August 26, 1958, who found that there had been a slipping forward of the L-5 vertebra on S-1 (spondylolisthesis) and noted the bone graft which he concluded had been made for the purpose of stabilizing the lower lumbar joints and the sacral joints so as to prevent motion in the area.
Although plaintiff in his petition only alleged an accident which took place on June 20, 1956, he attempted to testify that he sustained another accident on the last day he worked, June 24, 1956, but upon objection by defendants' counsel, such testimony was rejected. Plaintiff's counsel then informed the court plaintiff was basing his claim solely on the injury received in the truck on June 20, 1956.
It also appears from the copies of the reports of the Veterans Hospital made part of the record that plaintiff stated that he, on December 31, 1956 (long after he had severed his connection with Schlumberger Well Surveying Corporation), while driving a truck, had experienced a sudden onset of pain in his back when applying the brakes and that the pain was different from the pain in the back which he had before.
Counsel for defendants point out, and it is true, that plaintiff made various statements to the several physicians regarding the nature of the accident he claimed was causing his pain. For instance, he told Dr. Accardo he was injured June 26, 1956, while unloading heavy equipment from a rig barge; Dr. Fisher was told he had been knocked down and injured while unloading equipment June 20, 1956; he stated to Dr. Riordan his first experience of the backache occurred while riding in a truck as a passenger; and at the Veterans Hospital he told the physicians on the occasion of his first admittance that he noted the sudden onset of back pain while riding in a truck, and on the occasion of his visit in January 1957 he made the statement that on December 31, 1956, the pain occurred while applying the brakes to a truck he was driving.
It makes no difference what accidents or incidents plaintiff might have mentioned in giving the history of his condition to the various physicians; our concern is whether it was the initial accident which happened in the truck on June 20, 1956, that caused his present disability. Plaintiff testified he had always been in good health, had never known of any physical disabilities, and had been well able to withstand the actual combat conditions in the Korean War. The frostbite spoken of by Dr. Nicholson is connected with his military service. He has a sixth grade education and his working *98 career is mostly composed of jobs in which he was called upon to exert strenuous physical efforts. Until the incident in the truck he had never at any time been physically incapable of carrying out any of the duties which his various occupations required.
The spondylolisthesis with which plaintiff was and is now afflicted is of congenital origin. Dr. Fisher made that plain, as well as did Dr. Accardo, who appeared as a defense witness. Ever since June 20, 1956, plaintiff has suffered severe pains in the lower back. While Drs. Riordan and Accardo say there is nothing objective to account for the pain, Dr. Fisher, the last physician to see plaintiff, stated emphatically that there was great tenderness in the area of the lower back and that the patient, in his opinion, was suffering pain and was absolutely physically incapable of carrying on his occupation. Dr. Accardo, although stating he did not believe there was pain, advanced the opinion that the fusion of the vertebrae inhibited free motion and plaintiff would be unable to carry on the strenuous duties.
We do not know the exact nature of the occurrence of June 24, 1956, the last day plaintiff worked, because defendants' counsel objected to any evidence relative thereto. But we are convinced, after carefully reviewing the medical testimony and analyzing the entire record, that plaintiff's difficulties stem solely and only from the giving way of his back while riding in the truck. Plaintiff had the spondylolisthesis when treated at the Veterans Hospital in July and August 1956, and there is no doubt in our minds that the occurrence of December 31, 1956, when pain manifested itself when plaintiff applied the brakes of his truck, has nothing to do with the present disability. Dr. Fisher put it thus:
"I believe that very likely that the accident that occurred there at the beginning and the subsequent events were going to happen regardless of whether he was driving a truck. Now, as to whether or not any awkward motion would not cause some difficulty there, as previously asked, I think whether or not a slight movement could result in that, there is a remote possibility, but very remote, but percentagewise I think you are on safer grounds to assume that the initial accident is the main cause and what happened subsequently led up to surgery that was necessary."
We believe this to be a clear case where an accident, i.e., the jolting in the truck, aggravated the congenital spondylolisthesis. An aggravation of a latent weakness or the giving way of any portion of the laborer's body while engaged in his work constitutes a compensable accident. Hemphill v. Tremont Lumber Co., 209 La. 885, 25 So.2d 625; Turner v. Southern Industries Company, La.App., 88 So.2d 238; Rivero v. Leaveau, La.App., 45 So.2d 418.
Plaintiff is mistaken in his allegation that he received $160 from defendants as workmen's compensation. In fact he received no payments in compensation. However, he did receive several weeks of sick pay under the provisions of a group insurance policy carried by Schlumberger Well Surveying Corporation on its employees, and our thought is that plaintiff evidently has confused these payments with compensation benefits.
The judgment allowed plaintiff for medical expenses $647 represented by the bill of the Veterans Administration. This allowance was clearly in error. The plaintiff herein certified on a written form when applying for hospitalization that he was unable to pay therefor, which, of course, was a prerequisite to admission. A reading of the applicable federal statute makes certain that a veteran is entitled to free care and treatment in a veterans' facility if he make the required statement. Therefore, the Veterans Administration cannot charge for hospitalization or medical expenses and, hence, no recovery may be had by plaintiff for the amount of the bill. *99 Drearr v. Connecticut General Life Insurance Company, La.App., 119 So.2d 149.
The judgment also condemned defendants to pay $1,000 for attorney's fees. This award is also erroneous. Plaintiff does not pray for attorney's fees from defendants but merely sought a fixing of the fee of his own attorney in an amount not more than 20 percent of any award made by the court, the total fee not to exceed $1,000.
The judgment allowed each of the experts testifying in the case the sum of $100, but no complaint is made by appellants with regard thereto.
The judgment is erroneous in another respect. While it condemns defendants to pay compensation, the starting date for the weekly payments is fixed as June 25, 1960. The date should have been the seventh day following the accident causing the disability, to-wit: June 27, 1956.
Therefore, those portions of the judgment which allow plaintiff $647 for medical expenses and $1,000 for his attorney's fees be reversed and deleted, and it is now ordered, adjudged and decreed that the judgment be amended so as to fix the starting date for the payment of compensation as June 27, 1956, rather than June 25, 1960, and as thus amended and in all other respects the judgment is affirmed. The cost of this appeal is to be paid by appellants.
Reversed in part; amended and affirmed in part.

On Rehearing
Before McBRIDE, REGAN, YARRUT and HALL, JJ.
PER CURIAM.
In appellants' application for rehearing our attention was called to the fact that the accident which caused plaintiff's disability occurred prior to the amendment of LSA-R.S. 23:1202 by Acts 1956, No. 411, which became effective August 1, 1956. Consequently we granted a rehearing limited to the question of the amount of compensation due plaintiff.
By stipulation both parties concede that under Beloney v. General Electric Supply Company, La.App., 103 So.2d 491, and Talbot v. Trinity Universal Insurance Company, La.App., 99 So.2d 811, which hold that where the said amendment to LSA-R.S. 23:1202 increasing the maximum rate of compensation from $30 to $35 per week became effective subsequent to the accident, the increased rate of compensation as provided in the amendment cannot be applied, and the instant plaintiff is entitled to the maximum compensation of $30 per week, and they have submitted the case to us on rehearing for adjudication.
Therefore, our original decree is reinstated with the amendment thereto that the weekly compensation shall be at the rate of $30 per week rather than $35 per week, and as thus amended and in all other respects, it is made the final judgment of this court.
Original decree reinstated with amendment.